2021 IL App (1st) 192297-U

No. 1-19-2297

Order filed November 24, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 18468 |
| | ) | |
| MIGUEL HERNANDEZ, | ) | Honorable |
| | ) | Steven Goebel, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE REYES delivered the judgment of the court.
Justices Lampkin and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the summary dismissal of defendant's postconviction petition over his contention that he made an arguable claim of ineffective assistance of counsel for failure to present an expert in the field of eyewitness identification where defendant failed to attach supporting evidence and his claim was forfeited.

¶ 2    Defendant Miguel Hernandez appeals the summary dismissal of his *pro se* petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)). He argues that the trial court erroneously and summarily dismissed his petition where he made an

arguable claim of ineffective assistance of trial counsel for failure to investigate and present an expert in the field of eyewitness identification. For the following reasons, we affirm.

¶ 3    Following a jury trial, defendant was found guilty of the first degree murder of Eric Galarza, Jr. (Eric Jr.) and attempted murder of Eric Galarza (Galarza). The jury found defendant personally discharged a firearm that caused death. He was sentenced to consecutive sentences of 60 years' imprisonment for first degree murder and 18 years' imprisonment for attempted murder. We set forth the facts in defendant's direct appeal (*People v. Hernandez*, 2017 IL App (1st) 143544-U), and we recite them here to the extent necessary to our disposition.

¶ 4    The evidence at trial established that around 7 p.m. on October 7, 2011, Christina Ignacio (Christina), her sister Denisse Galarza (Denisse), Denisse's husband Galarza, and the Galarzas' three children Eric Jr., Luis, and Jayleen, all entered a vehicle parked in front of their residence on the 900 block of Elma Avenue in Elgin, Illinois. Christina, who was driving, attempted to make a U-turn when shots were fired at the vehicle. One of the shots hit Eric Jr., who was brought to the hospital and later died from a gunshot wound to the head. At the time of the shooting, Denisse noticed defendant, her second cousin, underneath a streetlight, facing the vehicle. She did not notice a firearm in defendant's hand but did observe flashes of light coming from his direction. Galarza testified he also observed defendant shooting in his direction. Christina did not see the shooter but heard Denisse scream, "It was Yagi. It was Yagi. I saw him. I saw him." Testimony at trial established that defendant went by the name of "Yagi." Galarza did not recall Denisse identifying the shooter as Yagi at that time.

¶ 5    Christina drove to a nearby gas station where police were waiting. Christina testified she informed the officers that Denisse identified Yagi as the shooter. Her statements, however, were not memorialized in any police report.

¶ 6    At the hospital, Galarza told the police that the shooter looked like defendant, but did not fully cooperate with police as he wanted to "seek [ ] revenge on my own." Galarza acknowledged he was a former member of the Latin Kings gang and informed police that defendant, a current Latin Kings member, might have shot at him in retaliation for Galarza's participation as a confidential police informant.

¶ 7    Denisse acknowledged that she initially lied to police, telling them her name was "Maria Ignacio" as she had an outstanding warrant for a DUI at the time and wanted to remain with Eric Jr. She later provided the police her real name. Denisse told the officers at the gas station that she "thought" the shooter was defendant but did not conclusively identify him as Galarza told her not to say anything. At the hospital, she described the shooter to police as a bald Latino with a medium build.

¶ 8    The Galarzas' neighbor Rolando Lopez (Rolando) testified he heard five or six gunshots on the night in question and then noticed a man in baggy, dark clothes running across the street. Rolando observed a black Toyota Tundra make a U-turn and drive in the same direction as the man was running.

¶ 9    Cory Morgan, who lived around the corner from the Galarzas, testified that, at the time of the shooting, she was outside with her boyfriend and heard six or seven "pops or booms." Morgan then observed a man walking in front of her residence. The man removed his blue shirt and was wearing a white tank top underneath. He was 10 to 15 feet away when he looked in Morgan's

direction, and she saw his face. She described the man as a shorter Latino with low-cut hair and a husky build. The next day, Morgan identified defendant in a photographic array, stating she was "80 percent" sure he was the man she noticed walking in front of her house but needed to "see the build and other characteristics." On October 14, 2011, Morgan identified defendant in a physical lineup and was "[a] hundred percent" sure that defendant was the man who she saw on October 7, 2011.

¶ 10 Carlos Lopez (Carlos), defendant's coworker, testified defendant called him around 7:40 p.m. on October 7, 2011, and invited him to Gameworks in Schaumburg, Illinois. When Carlos arrived around 8 p.m., defendant was there with his father, Miguel Hernandez Sr. (Miguel Sr.), and another man, whom Carlos later identified as Luis Acevedo. Defendant asked to speak privately with Carlos and asked him to hide a handgun for the night. Defendant stated that someone would call Carlos from a "224 number" the following day to retrieve the weapon. Carlos observed defendant take the firearm from the floor of a Toyota Tundra, wrap it in a navy blue shirt, and place it inside a white grocery bag. Carlos stored the bag with the handgun in his storage shed. Around 9:15 p.m., defendant called Carlos to ensure he had hidden the firearm.

¶ 11 The following day, Carlos received a phone call from a 224 number around 10 a.m. Acevedo retrieved the handgun from Carlos and drove away. A few minutes later, defendant called him to ensure the man had picked up the weapon. Defendant later admitted to Carlos that he had shot at a man who had "snitched on them" but accidentally shot a child. Carlos acknowledged he did not initially divulge that information to police. Carlos, however, later told police everything after they questioned him and told him he could be charged with conspiracy.

¶ 12    The evidence established that a black Toyota Tundra registered to Miguel Sr., without paying the toll, drove through a toll booth near the Galarzas' residence at 7:13 p.m. on October 7, 2011. Further, video surveillance footage from Gameworks, which was narrated by Carlos, depicted defendant, Carlos, Acevedo and Miguel Sr. inside the facility on the evening of October 7, 2011.

¶ 13    Cell phone analyses established defendant's phone was used less than a mile away from the 900 block of Elma Avenue between 4:10 p.m. and 7:02 p.m. on October 7, 2011, and then thereafter detailed movement of the phone towards Schaumburg, Illinois and eventually that the phone was near Gameworks. The analysis of Acevedo's phone also established that he made calls in Elgin shortly before the shooting, and a call near Gameworks shortly after the shooting. It further established that Acevedo's phone was near Carlos' residence on the morning of October 8, 2011. Further analyses established that prior to and after the shooting, defendant, Carlos, and Acevedo made calls to each other on October 7 and 8, 2011.

¶ 14    For the defense, Timothy Crenshaw, Morgan's boyfriend, testified he observed an individual walking around the corner toward them wearing a white shirt, but did not notice his face.

¶ 15    Officer McMahon testified that Christina initially identified herself as "Justina Ignacio" to the police at the gas station. She described the shooter as a short, bald man standing at the corner near the house.[1] Christina did not tell McMahon that she heard Denisse yell, "It's Yagi shooting at us."

---

[1] Officer McMahon's first name is not contained in the record.

¶ 16    On cross-examination, McMahon testified Denisse told him her name was "Maria Ignacio," and it was "possible" that he confused Christina and Denisse in his report. Although his report indicated Christina had an active warrant for her arrest, he realized when he returned to the station that Christina did not have a warrant out for her arrest. He, however, did not correct his report.

¶ 17    Detective Tom Wolek testified that Christina did not inform him she heard Denisse yell, "It's Yagi shooting." Denisse identified herself to him as "Maria Ignacio."

¶ 18    Defendant testified that he was a member of the Latin Kings. In the afternoon of October 7, 2011, Acevedo, who was also a member of the Latin Kings, approached him and his father while they were cleaning Miguel Sr.'s Toyota Tundra. Defendant, Acevedo, and Miguel Sr. entered the Toyota Tundra to go to a bar. Defendant testified Acevedo instructed him to park on a street near Galarza's residence. Acevedo exited the vehicle, and defendant subsequently heard gunshots. Defendant drove away. He saw Acevedo running nearby and picked him up. Acevedo was wearing a white, sleeveless shirt, with a blue shirt wrapped around his hand to conceal a handgun.

¶ 19    Defendant then drove to Gameworks. Acevedo ordered him to make a call, and defendant complied because he was afraid Acevedo would shoot him. Defendant called Carlos to meet him at Gameworks. Defendant gave Carlos the weapon wrapped in a plastic bag and stated someone with a 224 area code would call him regarding the handgun. Carlos subsequently left. Defendant then called his girlfriend, Juanita Ortiz, who met him at Gameworks. They left together to go to Juanita's house as he feared gang retaliation if he returned to his own house. Defendant did not pay attention to the fact he left his father with Acevedo and testified he just wanted to get away from Acevedo. Defendant acknowledged that he knew the Latin Kings wanted to retaliate against

Galarza for being a confidential informant. He, however, denied knowing that Acevedo intended to shoot Galarza that evening.

¶ 20 The jury found defendant guilty of the attempted murder of Galarza and first degree murder of Eric Jr. The jury further found defendant committed the offenses while personally discharging a firearm. The trial court sentenced defendant to consecutive sentences of 18 years for attempted murder and 60 years for first degree murder. We affirmed on direct appeal. *Hernandez*, 2017 IL App (1st) 143544-U.

¶ 21 On May 23, 2019, defendant filed a *pro se* postconviction petition under the Act, alleging, in relevant part, that trial counsel was ineffective for failing or refusing to obtain an eyewitness identification expert. Defendant asserted an expert "could have" "provide[d] information to the jury about the scientific basis of various relevant aspects of perception and memory" to assist the jury in assessing the reliability of the eyewitness testimony in his case. Defendant set forth a litany of information the expert "could have" testified to or explained, including that confident witnesses, like Morgan, were not always accurate.

¶ 22 On August 9, 2019, the circuit court summarily dismissed defendant's petition.

¶ 23 We allowed defendant leave to file a late notice of appeal on March 11, 2020.

¶ 24 On appeal, defendant contends the circuit court erred in summarily dismissing his petition as he made an arguable claim that trial counsel was ineffective for failing to investigate and present an eyewitness identification expert in support of the defense theory of misidentification where the State's case relied heavily on eyewitness testimony.

¶ 25 The Act sets forth a three-stage process as a means for criminal defendants to challenge their convictions based on constitutional violations. *People v. Beaman*, 229 Ill. 2d 56, 71 (2008).

Defendant's petition for postconviction relief was summarily dismissed at the first stage, where the trial court independently reviews the petition, taking the well-pleaded allegations as true, and determines whether the petition is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2018); *People v. Robinson*, 2020 IL 123849, ¶ 45. A petition may be summarily dismissed as "frivolous or patently without merit only if the petition has no arguable basis either in law or in fact." *People v. Hodges,* 234 Ill. 2d 1, 11-12 (2009); *People v. Tate,* 2012 IL 112214, ¶ 9. A claim has no arguable basis when it is based on an indisputably meritless legal theory, such as one completely contradicted by the record, or a fanciful factual allegation, such as those that are fantastic or delusional. *People v. Brown,* 236 Ill. 2d 175, 185 (2010).

¶ 26    To survive the first stage, a petition need only present the gist of a constitutional claim. *People v. Allen*, 2015 IL 113135, ¶ 24. Presenting a "gist" of a constitutional claim is a low threshold, and only limited detail is necessary for the petition to proceed beyond the first stage of postconviction review, as opposed to setting forth a claim in its entirety. *Hodges,* 234 Ill. 2d at 9; *People v. Williams,* 364 Ill. App. 3d 1017, 1022 (2006). We review the summary dismissal of a postconviction petition *de novo*. *Hodges,* 234 Ill. 2d at 9. We review the trial court's judgment and not the reasons cited for the judgment, and we may affirm the trial court on any basis supported by the record. *People v. Munoz*, 406 Ill. App. 3d 844, 850 (2010).

¶ 27    Initially, we note that the Act requires that a postconviction petition be supported by "affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2018). The purpose of this evidentiary requirement is to ensure a defendant's postconviction allegations are "capable of objective or independent corroboration." *People v. Hall*, 217 Ill. 2d 324, 333 (2005). The failure to comply with this

requirement is "fatal" and "by itself justifies the petition's summary dismissal." (Internal quotation marks omitted.) *People v. Collins*, 202 Ill. 2d 59, 66 (2002).

¶ 28    Defendant failed to comply with this requirement, as he did not attach any affidavit or other evidence supporting his claim and failed to explain the unavailability of these supporting materials. While there is no question that an expert can provide useful information to the trier of fact regarding the reliability of eyewitness identifications (see *People v. Lerma*, 2016 IL 118496, ¶ 24), defendant's contentions relate only to what an expert "could" have testified. Thus, his ineffective assistance claim based on counsel's failure to present an identification expert who allegedly would have testified in defendant's favor is unsupported and speculative. Accordingly, the circuit court was justified in summarily dismissing defendant's petition on this basis alone. *Id.*

¶ 29    Additionally, the State argues defendant forfeited his claim as it could have been raised on direct appeal. We agree. A postconviction proceeding is a collateral proceeding rather than an appeal of the underlying judgment and allows review of constitutional issues that were not, and could not have been, adjudicated on direct appeal. *People v. Towns*, 182 Ill. 2d 491, 502 (1998). Claims that could have been raised on direct appeal are barred. *Robinson*, 2020 IL 123849, ¶ 42.

¶ 30    Defendant contends trial counsel provided ineffective assistance for failing to call an expert in eyewitness identification in support of his misidentification theory of defense. Specifically, defendant alleges an expert in eyewitness identification could have (1) drawn attention to common misconceptions about eyewitness testimony; and (2) explained how Morgan's lineup identification of defendant deviated from best practices because it was conducted by the lead detective and Morgan had previously seen defendant in a photo array.

¶ 31     In *People v. Navarro*, 2021 IL App (1st) 190483, the defendant raised this identical issue in a motion for leave to file a successive postconviction petition under the Act. This court concluded that the defendant could not establish cause for failing to raise his claim earlier because the case law permitting the use of expert testimony on the issue of eyewitness identification "was available to the defendant at the time of direct appeal in 2007, and he should, and could, have raised the issue in that appeal." *Navarro*, 2021 IL App (1st) 190483, ¶ 13.

¶ 32     Although *Navarro* concerned a successive petition, and therefore a different standard for progressing under the Act, we find it instructive in the instant case where defendant raises the same issue, which could have and should have been asserted on direct appeal. Despite defendant's claim to the contrary, trial counsel's failure to call an eyewitness expert is apparent on the face of the record. As we pointed out in *Navarro*, the authority permitting the use of expert eyewitness testimony was decided in 1990 (see *People v. Enis*, 139 Ill. 2d 264 (1990)), and was therefore available at the time of defendant's trial in 2014. In fact, defendant acknowledges there was "ample legal authority at that time [of trial] to support the admission of expert testimony on misidentifications." See *People v. Allen*, 376 Ill. App. 3d 511, 521 (2007); *see also People v. Starks*, 2014 IL App (1st) 121169, ¶ 71; *People v. McGhee*, 2012 IL App (1st) 093404, ¶ 53. Given that defendant could have raised his claim on direct appeal, but did not, we find his claim is barred. See *Robinson*, 2020 IL 123849, ¶ 42.

¶ 33     We note that, in his petition, defendant did not claim that appellate counsel was ineffective for failing to raise on direct appeal trial counsel's ineffectiveness regarding the expert. Accordingly, we must honor his forfeiture of ineffective assistance of trial counsel claim. See *e.g.*, *People v. English*, 2013 IL 112890, ¶ 22 (in proceedings under the Act, the doctrines of *res*

*judicata* and forfeiture are relaxed "where the forfeiture stems from the ineffective assistance of appellate counsel"). The circuit court could properly dismiss his petition on this basis.

¶ 34    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 35    Affirmed.