2022 IL App (1st) 200805-U

No. 1-20-0805

Order filed April 28, 2022

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 3147 |
| | ) | |
| MARCELLUS FRENCH, | ) | Honorable |
| | ) | Mary Margaret Brosnahan, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Reyes and Justice Martin concurred in the judgment.

**ORDER**

¶ 1     *Held*: The trial court properly summarily dismissed defendant's postconviction petition which failed to establish arguable claims of actual innocence or ineffective assistance of counsel.

¶ 2     Defendant Marcellus French appeals from the circuit court's order summarily dismissing his *pro se* petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2018)). On appeal, defendant argues that his petition stated arguable claims of (1) actual innocence, (2) ineffective assistance of appellate counsel for failing to cite key evidence,

(3) ineffective assistance of trial counsel for failing to obtain a historical cell site expert to support his alibi defense, and (4) ineffective assistance of trial counsel for failing to obtain an expert in eyewitness identification.

¶ 3     For the reasons that follow, we affirm the judgment of the circuit court.[1]

¶ 4                              I. BACKGROUND

¶ 5     After a jury trial, defendant was found guilty of the first degree murder of Roger Kizer and aggravated battery with a firearm of Estavion Thompson. Codefendant Bodey Cook was also found guilty of first degree murder and aggravated battery with a firearm. The jury found that defendant personally discharged a firearm that caused death. Defendant was sentenced to consecutive terms of 55 years' imprisonment for first degree murder and 15 years' imprisonment for aggravated battery with a firearm. We set forth the facts in defendant's direct appeal (*People v. French*, 2017 IL App (1st) 141815), and we recite them here to the extent necessary to our disposition.

¶ 6     The State's evidence showed that at about 11 p.m. on August 19, 2010, the victims, Kizer and Thompson, were outside near 7450 South Kenwood Avenue in Chicago. Kizer's family lived on that block. Kizer and Thompson were either sitting on the back of a friend's parked car or standing by the car in the street. Several other people were also outside, including Andre Stackhouse, Shevely McWoodson, and Sherman Johnson. People were drinking alcohol. The street was residential and illuminated by streetlights.

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 7    Thompson testified that as the group sat in the street Cook drove a little green Cavalier past them. Thompson had known Cook from the area for about three years. Around 15 minutes later Cook again drove past in the same car and Kizer tried to flag Cook down. Cook kept driving and ultimately returned within ten minutes. On the third approach Thompson heard shots, saw Kizer fall, and tried to run away. Thompson saw Cook driving and a light-skinned male with a red hat shooting out of the car. The two individuals were in the same green car that had driven past the group on the other two occasions. Thompson suffered gunshot wounds to each of his legs, his chest, and his stomach. Kizer died at the scene from a gunshot wound to his chest.

¶ 8    Thompson was transported to the hospital. Thompson spoke with detectives at the hospital the next day and identified Cook as the driver from a photo array. At that time, Thompson did not know Cook's full name. Two days later, Thompson viewed a black and white photo array that included defendant's photo, but Thompson did not identify anyone as the shooter from that array. At that time, Thompson knew defendant's name but not his full name. At the trial, Thompson said defendant at the time of the shooting "looked totally different" from his black and white picture in the photo array. Thompson could not remember whether he told the police on August 22 that defendant was the shooter. On January 20, 2011, Thompson went to the police station and identified defendant, whom Thompson knew "from around the same area," as the shooter out of a four-person lineup. Witnesses Stackhouse, McWoodson, and Johnson were also at the police station, but they were not present when Thompson viewed the lineup. In February 2011, Thompson identified Cook from a lineup as the driver. Thompson also identified defendant and Cook in court as the offenders.

¶ 9    Thompson testified that no one made him any promises in exchange for his testimony. At the time of the trial, he had a pending misdemeanor marijuana charge. Thompson had prior felony convictions in 2005 for resisting a police officer and aggravated battery of a police officer and in 2004 for aggravated unlawful use of a weapon. When Thompson testified before the grand jury on February 16, 2011, he said he was under the influence when he had spoken with an assistant State's Attorney (ASA) in January 2011; however, at the trial Thompson denied being under the influence at the time of that conversation.

¶ 10    Andre Stackhouse was on parole at the time of the trial, failed to appear on the date specified by a subpoena, and was arrested and testified the next day. He had known both defendant and Cook since they were in preschool. Stackhouse had been drinking tequila on the night of the shooting. He was standing a couple of houses away from the Kizer home and talking with two girls when he saw Cook drive by in a greenish blue car. Not long thereafter, Stackhouse saw Cook drive east on 74th Street and then south on Kenwood Avenue. Defendant was in the passenger seat and half of his body was hanging out the window. He had a gun in his hand. Stackhouse did not see anyone in the car wearing a hat. Stackhouse moved into a gangway and heard several gunshots but did not look toward the shooting. After the shooting, he went to Kizer and Thompson and saw that they were shot. Sherman Johnson had a gunshot hole in his hat. Stackhouse left the scene and did not talk to the police that night.

¶ 11    On August 24, 2010, Stackhouse was arrested for a gun offense. He spoke with detectives on August 26 about the August 19 shooting. From photographs, Stackhouse identified Cook as the driver and defendant as the shooter. Stackhouse also identified defendant and Cook as the offenders in the lineups conducted in January and February of 2011 and again at the trial.

Stackhouse did not receive any promises concerning his gun offense or his probation violation in exchange for his testimony. He faced a possible prison sentence of three to seven years for the gun offense and received the minimum sentence of three years. He had convictions in 2011 for aggravated unlawful use of a weapon and in 2009 for possession of a stolen motor vehicle. When a defense investigator came to the Stackhouse home in June of 2012, Stackhouse's mother told the investigator to leave, and Stackhouse did not discuss the shooting with him.

¶ 12    Shevely McWoodson was Kizer's uncle. At the trial, McWoodson testified he had known Cook and defendant a few months prior to the shooting by seeing them on the street a few times. However, McWoodson previously told the grand jury that he had known defendant for about three years. At the time of the offense, McWoodson was with Kizer and a group of other people on south Kenwood Avenue talking. McWoodson saw Cook drive by once in a small car alone. Then McWoodson walked to his house a couple of houses away from the group to use the restroom. When he was near the gate of his house, he saw Cook drive by again with defendant in the passenger seat. McWoodson saw defendant lean out the window, fire a gun, and shoot Kizer. McWoodson heard three gunshots and saw the gun emit flames when it was fired. He did not speak with police that night.

¶ 13    In January 2011, McWoodson went to the police station and identified Cook from a photo array as the driver and defendant from a lineup as the shooter. At trial, McWoodson testified he "pointed [defendant] out" before he asked the police to have everyone in the lineup smile. McWoodson knew defendant had a chipped tooth, which was visible when defendant smiled. However, according to McWoodson's grand jury testimony, he "knew" it was defendant but was not "sure," so he asked the detective to make the lineup participants smile. McWoodson then saw

defendant's chipped tooth and said, "That is him." At a second lineup in February 2011, McWoodson identified Cook as the driver, but McWoodson did not recall returning to the police station to view that second lineup. McWoodson either did not understand what a grand jury was or did not remember testifying before the grand jury in February 2011.

¶ 14 Sherman Johnson was Thompson's cousin. Johnson had known Cook and defendant his whole life. At the trial, Johnson testified that on the afternoon of August 19, 2010, everyone was standing in front of a school when Kizer unsuccessfully attempted to flag down Cook, who was driving a red Cadillac. Later that evening, Johnson was standing with the group on the 7400 block of South Kenwood Avenue. About 30 people were outside, and they were drinking alcohol and doing drugs. He heard gunshots and ran from the scene without looking to see the source of the gunfire. He never saw who fired the gunshots, was not grazed on his elbow by a bullet, and did not have a bullet knock any hat off his head.

¶ 15 Johnson fled Chicago a week after the shooting because he was wanted for an attempted murder that occurred in an unrelated case on August 25, 2010. He was apprehended and extradited to Chicago on January 19, 2011. Thereafter, the detectives investigating this case brought him from the jail to the police station. Johnson claimed the detectives put him in a room with Thompson and urged him to "go with" Stackhouse's written statement. Johnson also claimed the police offered to help him with his pending case in exchange for his cooperation in this matter. Johnson denied or could not recall giving the police and ASA any statement. Johnson initially maintained he did not recall testifying before the grand jury in February 2011, later admitted on cross-examination that he did in fact testify before the grand jury, and then on redirect claimed again that he did not recall testifying before the grand jury. He denied identifying Cook and defendant

as the offenders and merely pointed them out in the photo arrays as people he knew. Johnson denied identifying defendant and Cook as the offenders in lineups conducted in January and February of 2011. Ultimately, Johnson pled guilty in his pending case in 2012 to a lesser charge of aggravated battery with a firearm, faced a possible sentence of 6 to 30 years in prison, and received a 7-year prison term without the detectives' help.

¶ 16    The State impeached Johnson's trial testimony with the testimony of detectives and the ASA; Johnson's January 21, 2011, signed written statement; his February 18, 2011, grand jury testimony; and a January 2011 photograph of his elbow. According to his written statement, Johnson saw Cook drive by in a light green Chevy Cavalier. Cook was alone, and Kizer called out Cook's name to get his attention. Kizer's cousins had a "beef" or argument with Cook. Cook did not stop and sped off. When Cook drove by again about 15 to 30 minutes later, defendant was hanging out the passenger-side window. The upper part of defendant's body was hanging out the window, and a gun was in his hand. Defendant fired the gun several times. The detectives testified that Johnson identified defendant as the shooter and Cook as the driver in photo arrays in January 2011, identified defendant in a January 2011 lineup, identified Cook in a February 2011 lineup, and was never told he would receive help in any pending case in exchange for talking about this case.

¶ 17    When ASA Morgan Creppel interviewed Johnson before presenting his testimony to the grand jury in February 2011, Johnson confirmed that the police and detectives never made any promises to him in exchange for his cooperation. According to Johnson's grand jury testimony, he was standing with Kizer and Thompson on south Kenwood Avenue at the time of the offense. Kizer's cousin, who was selling marijuana, got into a truck with a buyer. As the truck drove away,

the group noticed Cook, who was alone, follow the truck in a light turquoise Cavalier. When the truck returned, Cook, who was still alone, was still following the truck. Kizer tried to flag Cook down but Cook sped off. No one in the group noticed Cook's car as it approached them the third time. Johnson heard the first gunshot and looked in the direction from which the sound came. Johnson was shocked, "actually just got stuck," and "couldn't even move." He saw defendant hanging out of the passenger-side window of the car from his waist up, using the top of the car to try to balance himself, and pointing the gun at anybody and shooting. Cook was driving the car. Johnson saw Kizer get struck first and Thompson get struck next. Then bullets grazed Johnson's elbow and knocked his hat off his head.

¶ 18    The defense's evidence showed that defendant was with Romania Booker and her father Randy Alexander at the time of the shooting. They were at the home of Booker's grandmother. Booker was pregnant with defendant's child, and her due date was August 19, 2010, so defendant stayed with her in case her water broke. Alexander testified he and defendant stayed inside the house on August 19 but acknowledged they "were not joined at the hip." Alexander was convicted in 2011 of burglary and in 2007 of possession of a controlled substance. Booker testified that defendant remained by her side from noon on August 19 until the child was born on August 24. Booker stopped dating defendant before he was arrested in January 2011 in this case. Although Booker knew about the arrest, she never contacted the police to inform them of this alibi. Defendant's family helped Booker with expenses for the baby.

¶ 19    Cook's family members and friends testified that he was at the home of his aunt at the time of the shooting. He was setting up for and attending a large family surprise birthday party for the aunt that lasted from about 6 p.m. on Thursday, August 19 to 3:30 a.m. on Friday.

¶ 20    Defense investigator John Byrne testified that he had been a Chicago police detective and sergeant in the detective division for 25 years. When he went to Stackhouse's home in June 2012, he informed Stackhouse that he worked for the defense. Stackhouse agreed to speak with him about this case and invited him into the house. Byrne took notes during the interview, which he used to write his two-page, undated report. According to Byrne, Stackhouse said he did not see the face of either the shooter or driver when the car drove past him because it was dark outside and the incident happened quickly. Stackhouse merely saw the passenger extend an arm out the open window and fire a gun. Furthermore, in January 2011, detectives signed Stackhouse out of jail, brought him to the police station, and informed him that witnesses had already identified defendant as the shooter and Cook as the driver. The detectives said they would help Stackhouse with his pending case if he corroborated the testimony of those witnesses. Although Stackhouse told the detectives what they wanted to hear, they ultimately did not help him. Stackhouse mentioned his probation and asked Byrne if he could get in trouble for what he said during their interview. Stackhouse did not sign or review Byrne's report.

¶ 21    The jury found both defendant and codefendant guilty of first degree murder and aggravated battery with a firearm, with a finding that defendant personally discharged a firearm causing death.

¶ 22    Defendant filed a *pro se* posttrial motion with multiple allegations of ineffective assistance of counsel. Relevant to this appeal, defendant claimed that counsel failed to (1) present the testimony of Booker's grandmother and defendant's mother to support his alibi, (2) present defendant's cell phone records to show his phone was engaged in a call with the phone of defendant's mother at the time of the shooting, and (3) subpoena GPS records regarding

defendant's cell phone to show he was at the home of Booker's grandmother at the time of the offense.

¶ 23    During a *Krankel* hearing, trial counsel explained that she declined to call Booker's grandmother, Donna Alexander, because Alexander had told counsel that she had went into her room around 7 p.m. and did not see defendant for the rest of the evening. Trial counsel explained that she did not call defendant's mother, Melba Brown, because Brown was not with defendant on the evening of the crimes and, thus, would not have supported his alibi defense. Regarding the cell phone records, trial counsel explained that it was strategy not to use the records because, while they did show a phone call between defendant's phone and defendant's mother's phone around the time of the shooting, the records also showed text messages from defendant to Booker who defendant was supposedly with during the entirety of the evening. After discussing the strategy with defendant "at great length," trial counsel opted to present the "clean, credible" testimony from Booker and her father that defendant was by her side during the entire evening. Finally, as to the GPS records, trial counsel explained that there was no GPS evidence that placed defendant or his phone at a particular location.

¶ 24    The trial court rejected defendant's *pro se* claims, concluding that defendant had not made even a "preliminary showing" of ineffective assistance of counsel. The trial court found that trial counsel had done an excellent job representing defendant and protecting his rights.

¶ 25    Defendant then proceeded *pro se* and filed a motion to reconsider the trial court's decision not to appoint new counsel on his ineffective assistance claims. Defendant submitted affidavits from Donna Alexander and Melba Brown. Brown's affidavit stated that she would have testified that she "remembered speaking with [defendant] and romaina [*sic*] on the phone about 11 somthing

[*sic*] that night about the birth of his first child and comfort measures for Romaina [*sic*]." Alexander's affidavit stated that she would go to her room and nap from time to time but that she got up every half hour or so to check on defendant and Booker and that each time she checked defendant was at the house. Defendant also attached his phone records which showed a phone call from his number to his mother's number on August 19, 2010, that lasted from 11:24:49 p.m. to 11:27:15 p.m. Defendant also attached records to establish that the first 911 call regarding the shooting came in at 11:27:49 p.m.

¶ 26 The trial court denied defendant's motion to reconsider. The trial court also denied defendant's motion for a new trial. Defendant was sentenced to 55 years' imprisonment on the first degree murder conviction and 15 years' imprisonment on the aggravated battery with a firearm conviction. We affirmed on direct appeal. *French*, 2017 IL App (1st) 141815.

¶ 27 On December 20, 2019, defendant filed a postconviction petition. Defendant's petition alleged that, *inter alia*, (1) appellate counsel was ineffective for failing to establish trial counsel's ineffectiveness where trial counsel failed to thoroughly investigate defendant's cellular phone records which provided evidence concerning the location of defendant's phone during the crime, (2) trial counsel was ineffective for failing to seek the testimony of an eyewitness expert and an expert witness on cellular phone records, (3) defendant was denied a fair and impartial direct appeal proceeding where the circuit court did not include defendant's exhibits in the appellate record, (4) appellate counsel failed to present the ineffective assistance of trial counsel claim regarding the alibi witnesses with supporting facts, and (5) trial counsel was ineffective for failing to show that police authorities offered leniency to witnesses.

¶ 28    On February 5, 2020, the trial court dismissed defendant's postconviction petition, finding that the issues raised were frivolous and patently without merit. Defendant appeals the trial court's dismissal of his petition.

¶ 29                                II. ANALYSIS

¶ 30    On appeal, defendant argues that his postconviction petition stated arguable claims of (1) actual innocence, (2) ineffective assistance of appellate counsel for failing to cite key evidence, (3) ineffective assistance of trial counsel for failing to obtain a historical cell site expert to support his alibi defense, and (4) ineffective assistance of trial counsel for failing to obtain an expert in eyewitness identification. Defendant requests that this court reverse the circuit court's summary dismissal of his petition and remand for second-stage proceedings under the Act.

¶ 31    The Act provides a three-stage mechanism by which a criminal defendant may assert that his conviction resulted from the substantial denial of a constitutional right. *People v. Myles*, 2020 IL App (1st) 171964, ¶ 17; *People v. Delton*, 227 Ill. 2d 247, 253 (2008). At the first stage of a postconviction proceeding, the defendant is required to set forth only the "gist" of a constitutional claim, and the circuit court may summarily dismiss the petition if it finds that the petition is frivolous or patently without merit, *i.e.*, that it has no arguable basis in law or fact. *People v. Hodges*, 234 Ill. 2d 1, 9-10 (2009). We review the summary dismissal of a postconviction petition *de novo*. *Id.* at 9.

¶ 32                            A. Actual Innocence

¶ 33    Defendant's first claim is that his petition set forth an arguable claim of actual innocence. Defendant relies on a document where eyewitness Andre Stackhouse stated that he would like to recant his statement. The statement in full read:

> "I Andre Stackhouse would like to recant my Statement do [*sic*] to the fact that I was offered a plea deal for a lighter sentence if I testified against bodey cook in the murder of Rodger Kizer saying he was guilty and he was the murderer. I was told to say marcellus French was the murderer and bodey cook was the driver."

The statement was signed and notarized but not sworn.

¶ 34    "[T]here is footing in the Illinois Constitution for asserting freestanding innocence claims based upon newly discovered evidence under the Post–Conviction Hearing Act." *People v. Washington*, 171 Ill. 2d 475, 489 (1996). "Procedurally, such claims should be resolved as any other brought under the Act." *Id.* "To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial." *People v. Robinson*, 2020 IL 123849, ¶ 47. "Newly discovered evidence is evidence that was discovered after trial and that the petitioner could not have discovered earlier through the exercise of due diligence." *Id.* "Evidence is material if it is relevant and probative of the petitioner's innocence." *Id.* "Noncumulative evidence adds to the information that the fact finder heard at trial." *Id.* "Lastly, the conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result." *Id.* "The conclusive character of the new evidence is the most important element of an actual innocence claim." *Id.*

¶ 35    The State raises a threshold issue in response to defendant's claim. The State argues that the actual innocence claim was never raised in the trial court and, thus, cannot be raised for the first time on appeal. Defendant responds that he did raise the actual innocence claim in his petition, although it is discussed in the portion of the petition where defendant argues he was denied the effective assistance of counsel because trial counsel failed to show that authorities promised

leniency to witnesses in exchange for testimony. Defendant points to a single sentence in the petition, where he stated, "petitioner now presents newly discovered evidence where Andre Stackhouse, under sworn oath states he was offered leniency to testify against petitioner and co-defendant."

¶ 36    We agree with the State that defendant has forfeited a claim of actual innocence. Section 122-2 of the Act specifically provides that "[t]he petition shall *** clearly set forth the respect in which petitioner's constitutional rights were violated" (725 ILCS 5/122-2 (West 2018)), while section 122-3 provides that "[a]ny claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived" (*id.* § 122-3). It is black letter law that a defendant may not raise an issue for the first time on appeal from the dismissal of a postconviction petition if the petition failed to include that issue. *People v. Jones*, 211 Ill. 2d 140, 148 (2004); *People v. Coleman*, 183 Ill. 2d 366, 388 (1998); *People v. McNeal*, 194 Ill. 2d 135, 153 (2000); *People v. Jones*, 213 Ill. 2d 498, 505-06 (2004); *People v. Petrenko*, 237 Ill. 2d 490, 502 (2010).

¶ 37    The mention of Stackhouse's statement cited by defendant was directly related to the point heading claiming ineffective assistance of trial counsel. The point heading claimed that "trial counsel failed to show police authorities promised leniency to witnesses for testimony." The entire argument under the heading focused on evidence that Stackhouse and Sherman Johnson had been offered leniency to testify. Defendant cited Stackhouse's statement to corroborate John Byrne's trial testimony that Stackhouse was offered "help" with his pending case if he corroborated other witness statements implicating defendant and Cook in the shooting. Later, defendant described the "substance" of Stackhouse's statement as similar to what Byrne testified to at trial. Defendant never framed Stackhouse's statement as evidence of actual innocence.

¶ 38    In short, we conclude that, although a petition must be "given a liberal construction," *Hodges*, 234 Ill. 2d at 21, the reference in defendant's petition to Stackhouse's statement did not transform his claim into one of actual innocence. Because defendant's petition did not raise a claim of actual innocence, the claim is forfeited. 725 ILCS 5/122-3 (West 2018); *People v. Williams*, 394 Ill. App. 3d 236, 246 (2009) (holding that the defendant's actual innocence claim was "waived on appeal" where the defendant "failed to raise an actual innocence claim in the trial court").

¶ 39    Forfeiture aside, Stackhouse's statement does not set forth even an arguable claim of actual innocence because it is cumulative to, and less convincing than, Byrne's testimony at trial that Stackhouse told him that he did not see the face of either the shooter or the driver because it was dark outside and the incident happened quickly. Stackhouse's statement does not even say that he did not see the shooter or driver and, instead, simply says that he would like to recant his statement. More importantly, Stackhouse's statement neither arguably "places the trial evidence in a different light" nor "undermines the court's confidence in the judgment of guilt." *Robinson*, 2020 IL 123849, ¶ 56.

¶ 40    Stackhouse's statement is notable for what it does not say more than for what it does say. The statement does not say that defendant was not present at the scene of the shooting, that defendant did not commit the shooting, or that Stackhouse saw someone else commit the shooting. See *People v. Harper*, 2013 IL App (1st) 102181, ¶ 49 (noting that newly discovered evidence is "capable of producing a different outcome at trial" where it is "both exonerating and contradicts the State's evidence at trial"); *People v. Molstad*, 101 Ill. 2d 128, 135-36 (1984) (holding that newly discovered evidence was "likely to produce a different result in the trial" where five

codefendants submitted affidavits establishing that the defendant was not present when the crime was committed); *People v. Smith*, 2015 IL App (1st) 140494, ¶ 23 (finding the conclusive character element met where an eyewitness did not merely deny his earlier identification but exonerated the defendant and named a different perpetrator). In short, nothing about Stackhouse's statement exonerates defendant.

¶ 41 What Stackhouse's statement does say is that he would like to recant his statement because he was offered a lighter sentence if he testified in this case. The statement also says Stackhouse was told to say that defendant was the "murderer" and that Cook was the driver. At best, Stackhouse's statement may call into question his multiple prior identifications of defendant as the shooter. However, the creation of doubt in Stackhouse's prior identifications is not sufficient to establish an arguable claim of actual innocence. See *People v. Calhoun*, 2016 IL App (1st) 141021, ¶ 29 (rejecting an actual innocence claim where the lone testifying eyewitness averred that he held "doubts" about his trial identification of the defendant but otherwise did not exculpate the defendant or name an alternate perpetrator).

¶ 42 The statement also does not impact the remaining eyewitness identification evidence. Estavion Thompson identified Cook as the driver the day after the shooting and defendant as the shooter in January 2011. Thompson also identified both Cook and defendant at trial. Thompson knew both from the area. Shevely McWoodson similarly identified defendant as the shooter during his trial testimony. McWoodson had previously identified Cook from a photo array and defendant from a lineup as the shooter in January 2011. There was also evidence from eyewitness Sherman Johnson, who had identified defendant as the shooter in a January 2011 photo array and during grand jury proceedings in February 2011, before attempting to disavow the prior identifications

during trial. As this court noted on direct appeal, Johnson's statements identifying defendant as the shooter and Cook as the driver "were essentially consistent with and even more detailed than the identification testimony" of Thompson and McWoodson.

¶ 43    In short, Stackhouse's statement did nothing to exonerate defendant or implicate another individual in the shooting. Stackhouse's vague assertion that he would like to recant his statement has to be weighed against his identification of defendant as the shooter in a photo array five days after the shooting, his identification of defendant as the shooter in lineups conducted in January and February 2011, and his identification of defendant at the 2013 trial. The statement, when viewed in conjunction with the trial evidence, simply does not make out an arguable claim that the addition of Stackhouse's statement would probably lead to a different result at trial. Thus, even assuming defendant adequately raised the actual innocence claim in the trial court, it was properly summarily dismissed because defendant failed to set forth an arguable claim of actual innocence.

¶ 44                         B. Ineffective Assistance Claims

¶ 45    Defendant also raises three claims of ineffective assistance of counsel. "A criminal defendant is guaranteed the right to the effective assistance of counsel by both the United States and Illinois Constitutions." *People v. Johnson*, 2021 IL 126291, ¶ 52; U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Ineffective assistance of counsel claims are governed by the familiar test set forth in *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504, 525 (1984). To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but

for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-88.

¶ 46    "At the first stage of postconviction proceedings, a petition alleging ineffective assistance of counsel may not be summarily dismissed if (1) counsel's performance arguably fell below an objective standard of reasonableness and (2) the petitioner was arguably prejudiced by the deficient performance." *People v. Hatter*, 2021 IL 125981, ¶ 25. Defendant also alleges the ineffective assistance of direct appellate counsel. For that claim, "defendant must show both that appellate counsel's performance was deficient and that, but for counsel's errors, there is a reasonable probability that the appeal would have been successful." *People v. English*, 2013 IL 112890, ¶ 33.

¶ 47          1. Ineffective Assistance of Appellate Counsel: Failure to Cite Key Evidence

¶ 48    Defendant's first ineffective assistance argument is that appellate counsel was ineffective for failing to effectively cite key evidence in support of his direct appeal claim that trial counsel possibly neglected his case by failing to present crucial cell phone evidence to corroborate his alibi. The State argues that defendant's claim is barred by *res judicata* and otherwise does not constitute an arguable claim of ineffective assistance. Defendant responds that the issue raised in this appeal is "different, as it rests on ineffective assistance of appellate counsel for failing to cite a key point in support of the argument raised on direct appeal, preventing this Court from accurately assessing trial counsel's performance vis a vis [defendant's] alibi."

¶ 49    Defendant's claim is barred by *res judicata*. "In an initial postconviction proceeding, the common law doctrines of *res judicata* and waiver operate to bar the raising of claims that were or could have been adjudicated on direct appeal." *People v. Blair*, 215 Ill. 2d 427, 443 (2005). "The doctrine of *res judicata* bars consideration of issues that were previously raised and decided on

direct appeal." *Id.* "The petitioner may not avoid the bar of *res judicata* simply by rephrasing issues previously addressed on direct appeal." *People v. Simms*, 192 Ill. 2d 348, 360 (2000); *People v. Munz*, 2021 IL App (2d) 180873, ¶ 29 (finding an argument barred by *res judicata* where the argument was a "repackaged version of the argument" rejected on direct appeal).

¶ 50 On direct appeal, appellate counsel first noted the *pro se* contentions made by defendant in the trial court that established a possible neglect of defendant's case. The two contentions relevant here were described as follows: (1) "Defendant's attorney *** failed to call Melva Brown, Defendant's mother, who would have testified that she was on the phone with Defendant while Defendant was at Alexander's house at the exact time the shooting occurred" and (2) "Defendant's attorney *** failed to introduce phone records showing that a phone registered to Defendant was on a call with Brown's phone at the exact time of the shooting." Appellate counsel argued that defendant's allegations showed possible neglect by trial counsel for failing to adequately investigate and present exculpatory testimony and evidence on defendant's behalf. Appellate counsel supplemented the record with Brown's affidavit stating that she spoke to defendant and Booker around 11 p.m. on the night of the shooting. Appellate counsel also supplemented the record with defendant's cell phone records establishing a call was placed between defendant's phone and his mother's phone near the time of the shooting. Appellate counsel cited to each document in defendant's reply brief.

¶ 51 This court on direct appeal framed defendant's argument as follows: "[C]ounsel failed to present the testimony of Melva Brown, who is defendant's mother and would have testified that at the time the shooting occurred she was on the telephone with defendant while he was at Alexander's home." This court noted trial counsel's recognition of phone records which indicated

a call occurred between defendant's cell phone and his mother's cell phone near the time of the shooting. On the other hand, the records also showed defendant had been texting Booker on the evening of the shooting, "which would have diminished the alibi testimony that defendant never left Booker's side that evening." This court also noted that trial counsel had provided the phone records to defendant and reviewed the strategy many times with both defendant and his mother.

¶ 52    Ultimately, the underlying claim here, whether defendant's *pro se* allegations made out a claim of possible neglect, is the same issue that was raised and decided on direct appeal. Also, the claim is dependent on the record as it existed at the time of the direct appeal. In other words, defendant has not pointed to anything from outside the direct appeal record that would shed light on this issue. Thus, there is no basis to relax the doctrine of *res judicata*. See *People v. English*, 2013 IL 112890, ¶ 22 (explaining that the "doctrines of *res judicata* and forfeiture are relaxed *** where the facts relating to the issue do not appear on the face of the original appellate record"). Because this claim is barred by *res judicata*, the trial court properly dismissed it at the first stage of proceedings.

¶ 53         2. Ineffective Assistance of Trial Counsel: Failure to Obtain GPS Expert

¶ 54    Defendant next contends that his petition contained an arguable claim that trial counsel was ineffective for failing to obtain an historical cell site expert to interpret and testify about his phone records. Defendant argues that the unnamed expert "could have offered an opinion or explained to the jury any location data associated with French's cell phone records, which arguably could have corroborated alibi witnesses' assertions that French was with them at the time of the shooting." Defendant concludes that the information would have bolstered the defense theory that defendant was not in the location of the shooting at the time it occurred.

¶ 55    The State responds that defendant's argument is barred by *res judicata*, where it essentially mirrors defendant's direct appeal claim that trial counsel was ineffective for failing to present cell site evidence to show the location of his phone during the shooting. The State also argues that defendant forfeited this argument by not raising it on direct appeal. Finally, the State contends that defendant cannot make out even an arguable claim of prejudice because defendant did not allege that there is an expert who would provide beneficial testimony and, instead, defendant only provided general information about cell site analysis rather than cell site information relevant to this case.

¶ 56    A postconviction petition "shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2018). "It is enough for first-stage purposes that the defendant has provided substantive evidentiary content showing his claims are capable of corroboration and independent verification." *People v. Allen*, 2015 IL 113135, ¶ 37. The evidentiary content must also "identify with reasonable certainty the sources, character, and availability of the alleged evidence supporting the petition's allegations." *People v. Delton*, 227 Ill. 2d 247, 254 (2008).

¶ 57    Defendant's petition and accompanying evidentiary materials fail to establish with reasonable certainty the availability of either beneficial cell site location evidence or an expert willing to provide beneficial testimony. To be sure, defendant has presented evidence that cell site location evidence exists in certain circumstances, which the State could not and does not dispute. See *People v. Fountain*, 2016 IL App (1st) 131474, ¶ 59 (noting that "the use of cell phone location records to determine the general location of a cell phone is not 'new' or 'novel' and has been

widely accepted as reliable by numerous courts throughout the nation"). However, the fact that the evidence exists in some cases does nothing to establish that it exists in defendant's case.

¶ 58    Of note, the same single-page cellular phone record has been used as evidence in all the proceedings that have occurred since defendant's trial. Defendant proffered the phone records in support of his posttrial *pro se* motion alleging ineffective assistance of counsel. Defendant stated to the court that the document was his subpoenaed cell phone record provided by trial counsel. During the *Krankel* hearing on this issue, trial counsel unequivocally stated that there was no evidence that placed defendant's phone in a particular location. On direct appeal, this court noted that it was unclear whether defendant's claim pertained to a failure to subpoena GPS records or a failure to present GPS evidence that had already been subpoenaed.

¶ 59    In this appeal, it is no clearer whether any cell site evidence exists for defendant's phone. Defendant has provided a sample phone record from Independent Digital Forensics Laboratory that displays where cell site information can be found on a Sprint phone record. However, defendant's single-page phone record does not contain the column where the cell site information would be found. It is doubtful that the cell site information would be available now, nearly twelve years after the shooting, when it was not available when the records were produced in July 2012. Defendant has otherwise not provided any additional evidence to establish a reasonable certainty that favorable cell site evidence exists. Without any cell site evidence, it is unclear how an expert witness in the area would benefit defendant's case.

¶ 60    Because defendant failed to attach evidence to his petition establishing to a reasonable certainty that beneficial cell site information exists in his case, the trial court properly dismissed this claim at the first stage of proceedings.

¶ 61        3. Ineffective Assistance of Trial Counsel: Failure to Obtain Eyewitness Expert

¶ 62    Defendant's final contention is that trial counsel was ineffective for failing to obtain an expert witness in the field of eyewitness identification. Defendant lists several topics an expert "could have" testified about, including: (1) the unreliability of particular lineup procedures, (2) the phenomenon of "mugshot commitment," (3) the low correlation between a witness's confidence and the accuracy of his or her identification, (4) the effect a weapon has on identifications, and (5) the fallibility of an identification of a person by an acquaintance. Defendant did not raise this issue on direct appeal and, thus, the issue is forfeited.

¶ 63    "[W]here a petitioner has previously challenged a judgment of conviction on appeal, the judgment of the reviewing court will serve to bar postconviction review of all issues actually decided by the reviewing court as well as any other claims that could have been presented to the reviewing court." *People v. Robinson*, 2020 IL 123849, ¶ 42. As defendant recognizes, the scientific research around eyewitness identifications was "sound and widely accepted" at the time of his trial. As far back as 1990, the Illinois Supreme Court began to recognize the emergence of eyewitness expert testimony. See *People v. Enis*, 139 Ill. 2d 264, 286-87 (1990) (noting that "in the past decade a number of courts have held that expert testimony concerning eyewitness identification should be admissible in certain circumstances").

¶ 64    In *People v. Navarro*, the defendant filed a motion for leave to file a successive postconviction petition. *People v. Navarro*, 2021 IL App (1st) 190483, ¶ 1. In the petition, defendant alleged that trial counsel was ineffective for failing to call an expert witness to testify about the reliability of eyewitness identifications. *Id.* This court rejected the defendant's argument that he established cause for failing to raise the claim earlier in the proceedings, concluding "the

claim that the defendant's counsel was ineffective for failing to offer expert testimony on the subject of eyewitness identification was available to the defendant at the time of direct appeal in 2007, and he should, and could, have raised the issue in that appeal." *Id.* at ¶ 13; see also *People v. Hernandez*, 2021 IL App (1st) 192297-U, ¶ 32 (finding an argument identical to defendant's forfeited where "the authority permitting the use of expert eyewitness testimony was decided in 1990" and "trial counsel's failure to call an eyewitness expert [was] apparent on the face of the record").

¶ 65 Defendant has forfeited this argument by failing to make the argument on direct appeal. Defendant has also not argued that direct appellate counsel was ineffective for failing to argue trial counsel's ineffectiveness on this basis. See *People v. English*, 2013 IL 112890, ¶ 22 (noting that the doctrine of forfeiture is relaxed "where the forfeiture stems from the ineffective assistance of appellate counsel"). For these reasons, this issue was properly dismissed by the trial court.

¶ 66                                    III. CONCLUSION

¶ 67 For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 68 Affirmed.